## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————— )
)
MILTON HOSPITAL TRANSITIONAL )
CARE UNIT, )
               Plaintiff, )
)
        v. )      Civil Action No. 03-0155 (RBW)
)
TOMMY THOMPSON, )
             Defendant. )
—————————————————————— )

## MEMORANDUM OPINION

      The plaintiff, Milton Hospital Transitional Care Unit ("Milton"), a skilled nursing facility located on the campus of Milton Hospital in Milton, Massachusetts, brings this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., to overturn a decision by the Secretary of the Department of Health and Human Services ("Secretary"), denying Milton a "new provider exemption" under Medicare regulation 42 C.F.R. § 413.30(e) (1997). Complaint ("Compl.") ¶¶ 1, 5. Currently before the Court are the Plaintiff's Motion for Summary Judgment ("Pl.'s Mot."), the Defendant's Motion for Summary Judgment ("Def.'s Mot."), and the parties' oppositions thereto.[1] For the reasons that follow, this Court will grant the plaintiff's motion, and deny the defendant's motion.

---

      [1] Specifically, the following papers have been submitted to the Court: (1) Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem."); (2) Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Mem."); (3) Memorandum in Opposition to Defendant's Motion for Summary Judgment and Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Pl.'s Reply"); (4) Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Def.'s Reply"); (5) Plaintiff's Supplemental Memorandum of Law ("Pl.'s Supp. Mem."); (6) Defendant's Supplemental Brief ("Def.'s Supp. Mem."); (7) Plaintiff's Reply Memorandum ("Pl.'s Supp. Reply"); and (8) Defendant's Reply to Plaintiff's Supplemental Memorandum of Law ("Def.'s Supp. Reply").

## I.   Background

**A.    Regulatory Background**

To better understand the dispute in this case, it is helpful first to set forth the regulatory

scheme which is at issue here.[2]

(1)    Federal Regulatory Scheme

Title XVIII of the Social Security Act established a system of health insurance for the

aged and disabled, which is commonly referred to as the Medicare Program.  See 42 U.S.C.

§ 1395 et seq.  The Medicare Program is administered by the Secretary through the Centers for

Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing

Administration ("HCFA").  St. Elizabeth's Med. Ctr. of Boston v. Thompson, 396 F.3d 1228,

1230 (D.C. Cir. 2005).  Under the Medicare Program, a facility meeting the requirements of a

skilled nursing facility ("SNF") can receive reimbursement for the "reasonable costs" it incurres

for certain inpatient hospital and post-hospital extended care services provided to Medicare

beneficiaries, subject to certain cost limits under 42 U.S.C. §§ 1395c, 1395d, 1395i, 1395x(b),

(i), 1395yy(a) and 42 C.F.R. § 413.30 (1997).[3]

"Seeking to encourage Medicare-certified provides to operate efficiently, Congress has

instructed the Secretary . . . to cap payments under these programs at what he determines to be

reasonable cost limits . . . and apply statutory norms in the determination."  St. Elizabeth's, 396

F.3d at 1230 (internal citations omitted).  A "reasonable cost," as applied to routine service and

---

[2]  The District of Columbia Circuit recently provided a comprehensive overview of the regulatory scheme in St. Elizabeth's Med. Ctr. of Boston v. Thompson, 396 F.3d 1228, 1230-31 (D.C. Cir. 2005).

[3]  This C.F.R. provision has been subsequently amended.  However, the parties do not dispute that the 1997 version of this regulation is controlling here.

ancillary service costs at a freestanding SNF,[4] is 112% of the adjusted average amount of per

diem routine service costs incurred by similar SNFs nationwide, adjusted to the prevailing wage

rates of SNFs in the area.  42 U.S.C. § 1395yy(a).  Any amount above a reasonable cost is

deemed to be "unnecessary in the efficient delivery of needed health services" and is therefore

disallowed.  42 U.S.C. § 1395x(v)(1)(A).[5]  Thus, costs exceeding the reasonable costs cap are

deemed unreasonable and are not reimburseable.  Id.  However, the Secretary can provide

exemptions from that cap, 42 U.S.C. § 1395yy(c), and this has been done by establishing a "new

provider exemption," which "allow[s] a provider to recoup the higher costs normally resulting

from low occupancy rates and start-up costs during the time it takes to build its patient

population," Paragon Health Network, Inc. v. Thompson, 251 F.3d 1141, 1149 (7th Cir. 2001)

(internal quotation marks omitted).  This exemption lasts until "the end of the provider's first

cost reporting period beginning at least two years after the provider accepts its first patient."  42

C.F.R. § 413.30(e) (1997).  Specifically, the new provider exemption in effect at the time Milton

sought the exemption provided:

> Exemptions from the limits imposed under this section may be granted to a new provider.
> A new provider is a provider of inpatient services that has operated as the type of provider
> (or the equivalent) for which it is certified Medicare, under present and previous
> ownership, for less than three full years.

Id.  Thus,

> to qualify for the new provider exemption, a facility must show that it is either (1) new, or
> (2) operating for the first time as a SNF or equivalent.  It follows logically that facilities
> that (1) have operated before under "present or previous ownership," and (2) have

---

[4]  A reasonable cost calculation for hospital-based SNFs is slightly different.  See 42 U.S.C. §
1395yy(a)(3)-(4).

[5]  The reasonable costs limitation applies only to routine service and ancillary service costs, and not capital-
related or non-capital routine service costs.  Def.'s Mem. at 3-4.

operated as a SNF or equivalent, cannot qualify as "new providers."

St. Elizabeth's, 396 F.3d at 1231 (emphasis in original).[6]   As the District of Columbia Circuit has

recognized, "[t]here is no definitive court precedent as to what it means to operate as a SNF or its

equivalent," and there is a split in the various United States Court of Appeals "over whether it is

reasonable for CMS to attribute operation under previous ownership to a newly opened SNF

solely because it acquired such rights" from another facility as required under state law.  Id.

(2)   Massachusetts' Regulatory Scheme

The Commonwealth of Massachusetts regulates health care facilities in its jurisdiction, in

part, by issuing a Determination of Need ("DON").  A DON functions to ensure that "adequate

health care services are made reasonably available to every person in the [Commonwealth] at the

lowest reasonable aggregate costs," and does so by regulating the construction, relocation, and

expansion of health care facilities.  See Mass. Regs. Code tit. 105, § 100.532.  Prior to beginning

construction on a health care facility, the owner of that facility must first obtain a DON from the

Massachusetts Department of Public Health, indicating that there has been a determination that

there is a need for such a facility. Mass. Gen Laws. ch. 111, § 25C.  Since 1992, Massachusetts

has imposed a moratorium on DON applications for new nursing facility beds; thus, to obtain

such a right, a facility must first acquire an existing nursing facility or transfer ownership of an

unimplemented project, and then request that a DON be transferred to the new facility or

location.  Def.'s Mem. at 8-9.  In addition, any nursing facility must be licensed as either a level

I, II, III, or IV facility in order to operate in the Commonwealth.  Pl.'s Mem. at 7-8.

---

[6] In some cases, the new provider exemption may be made available to relocated providers.  See St. Elizabeth's, 396 F.3d at 1231.

4

**B.      Factual Background**

Milton is a 20-bed hospital-based SNF located on the campus of Milton Hospital in

Milton, Massachusetts.  Administrative Record ("A.R.") at 2.  In 1994, Neponset Hall, Inc.

("Neponset") owned and operated two licensed nursing homes—Neponset Hall Nursing Home

and Ashmont Manor Nursing Home—with a total of 175 beds in Dorchester, Massachusetts.  Id.

at 675, 698.  The Neponset nursing homes were Medicaid-certified as "nursing facilities."  Id. at

3.  On July 20, 1994, Neponset received a DON from the Massachusetts Department of Public

Health "for new construction to replace and relocate" Neponset's two nursing homes into a

single facility with 187 beds to be located in Milton, Massachusetts.  Id. at 675.  In order to open

its own facility on the campus of Milton Hospital, Milton agreed on September 23, 1994, to

purchase a 20-bed portion of Neponset's DON authorization for the new construction for

$400,000 in order to transfer the beds to Milton's new facility.  Id. at 698.  In a letter to Neponset

dated October 28, 1994, the Massachusetts Department of Public Health indicated that Milton's

transfer request would be granted.  Id. at 709-10.  Subsequently, in December 1995, the

Massachusetts Department of Public Health informed Neponset that because the "transfer will

occur before the replacement facility is constructed,  . . . [the transfer] must be associated with an

actual decrease in the number of originally <u>licensed</u> beds, rather than a decrease in not yet

licensed beds."  Id. at 1232 (emphasis in original).  The final plans for Neponset's replacement

facility—Marian Bay Skilled Nursing and Rehabilitation Center ("Marina Bay")—were not

approved until June 3, 1999.  Id. at 114.  However, on January 9, 1995, the Massachusetts

Department of Public Health had notified Milton that its architectural plans had been approved,

id. at 1235-36, and that Milton's licensure would be contingent upon the "prior or simultaneous delicensure of beds" at Ashmont Manor and/or Neponset Hall, or the "prior or simultaneous delicensure of 20 beds at the facility resulting from the completed consolidation" of Ashmont Manor and Neponset Hall. Id. at 1237. On May 1, 1995, Milton's received a license to operate a 20-bed nursing facility. Id. at 2795. On that same date, the Massachusetts Department of Health "permanently eliminated 20 level III beds" at the Neponset Hall facility. Id. at 3209. Milton also admitted its first patient on that same day. Id. at 2, 74, 2799.

On May 12, 1996, Milton was certified to receive Medicare payments, id. at 2, 74, 2797-98, and on June 2, 1995, submitted a request for an exemption from the SNF routine service cost limits as a new provider, id. at 2797-2801. On November 20, 1995, the CMS denied Milton's request for a new provider exemption. Id. at 623-27. Milton appealed this decision to the Provider Reimbursement Review Board ("PRRB"), id. at 631-32, which reversed CMS's denial of Milton's request, id. at 73-128. However, on December 3, 2002, the Administrator of the CMS ("Administrator"), on behalf of the Secretary, reversed the PRRB's decision, concluding that the "CMS correctly determined that the Provider in this case did not meet the criteria . . . for the new provider exemption." Id. at 12.

The gravamen of the Administrator's decision was that the "transfer of operation rights [from Neponset to Milton of the 20-beds] constitutes a change of ownership transaction for purposes of determining whether the Provider qualified for an exemption as a new provider." Id. at 11. Thus, the Administrator determined that because Milton acquired the rights to the beds from Neponset, it had effectively operated previously under different ownership. Moreover, the Administrator concluded that

> the record shows that the prior owner of the beds [Neponset], as a [nursing facility], was a Medicaid certified Nursing Facility, and had provided skilled nursing and related services for more than three years prior to the transfer of ownership.  Thus, the prior owner was clearly an equivalent provider of skilled nursing and/or rehabilitative services for more than three years.

Id.  In addition to being a Medicaid-certified nursing facility, which the Administrator posits

mandates a conclusion that Neponset was a nursing-facility, the Administrator found that

Neponset was "clearly an equivalent provider of skilled nursing and/or rehabilitative services for

more than three years."  Id.  In support of this conclusion, the Administrator noted that there is

"evidence in the record from a CMS database maintained to track the kinds of services provided

by health care facilities," which indicates that Neponset was providing skilled nursing services.

Id. at 11-12.  Accordingly, the Administrator concluded, based upon the change of ownership of

the rights to the beds, that Milton had operated under "present or previous ownership," as a SNF

or its equivalent.  Id. at 12.

Milton now appeals the Administrator's final agency action, alleging that it was not

supported by substantial evidence in the record and that it was arbitrary and capricious, an abuse

of discretion, and otherwise not in accordance with the law in violation of the APA.  Compl. ¶¶

31, 37.

**C.      St. Elizabeth's Med. Ctr. v. Thompson Opinion**

_____Before this Court had the opportunity to resolve the dispositive motions in this case, the

District of Columbia Circuit was presented with a case with nearly identical issues.  Accordingly,

this Court, with the consent of the parties, stayed the proceedings in this case until the District of

Columbia Circuit resolved the case before it, which it has now done.  In that case, St. Elizabeth's,

in 1996, purchased operating rights from an existing nursing home—Friel Nursing Home—in

order to open a transactional care unit.  St. Elizabeth's, 396 F.3d at 1231.  The "sole purpose" of

the purchase was to obtain a DON from the Massachusetts Department of Public Health, which

was required at that time under state law, to open a new nursing facility.  Id.  St. Elizabeth's

transactional care unit qualified as a SNF under the Medicare statute, and in January 1997, St.

Elizabeth's applied to the CMS for a new provider exemption for its new facility.  Id. at 1231-32.

The CMS denied St. Elizabeth's request "on the basis that (1) the [transactional care unit] 'was

established due to the purchase and relocation of 29 long term care beds  . . .' which, (2) as a

Medicaid-certified nursing facility ("NF"), provided the same 'type of services' as the

[transaction care unit]."  Id. at 1232.  In essence, the "CMS determined that because the

[transactional care unit] acquired operating rights from Friel, it in effect operated previously

under other ownership.  Further, the CMS determined that Friel's status as a [Medicaid-certified]

nursing facility qualified it as a SNF or its equivalent."  Id.  This decision was later reversed by

the PRRB.  Id.  However, in December 2002, the Secretary, acting through the CMS

Administrator, reversed the PRRB's decision concluding that St. Elizabeth's "did not qualify for

the new provider exemption because (1) the fact that it was opened using operating rights

acquired from Friel meant it had already been in operation under prior ownership, and (2) Friel

'was an equivalent provider of skilled nursing and/or rehabilitative services.'"  Id. at 1233.  St.

Elizabeth's filed suit in the district court, which affirmed the Secretary's decision.  Id. at 1232.

On appeal, the District of Columbia Circuit reversed "on the basis that the Administrator

lacked substantial evidence to conclude that Friel operated as a SNF or its equivalent."  Id. at

1232-33.  Thus, St. Elizabeth's was entitled to a new provider exemption.  Id. at 1233.  In

reaching its decision, the Circuit Court noted that "[u]nder the terms of the governing regulation,

both [of the Secretary's conclusions] had to be made to disqualify the [transactional care unit] from the exception," and that the Administrator addressed only the second conclusion—the equivalency of the providers.  Id. at 1233.  Moreover, the Circuit Court rejected the Secretary's position that St. Elizabeth's and Friel were equivalent because "Friel was a Medicaid-certified NF and operated as such."  Id. at 1233.  First, the Court compared the statutory definitions of a nursing facility under the Medicaid statute[7] with a skilled nursing facility under the Medicare statute,[8] and concluded that while "the range of services provided by a NF can encompass skilled nursing or rehabilitative care" and that some facilities may be qualified as both NFs and SNFs, "a facility must be primarily engaged in providing skilled nursing or rehabilitative care to qualify as a SNF, whereas a facility need not even offer such services at all to qualify as a NF."  Id. at 1234 (emphasis in original).  Thus, the Court concluded that "the bare fact [that] an institution has gained NF status or is operating as a NF, without more, is not sufficient to qualify the NF as a SNF or its equivalent."  Id.  Moreover, the Court noted in St. Elizabeth's that "[t]he record evidence is all to the effect that Friel was primarily engaged in providing custodial care to its

---

[7]  The Medicaid statute defines a NF as:
  [A]n institution (or a distinct part of an institution) which—
  (1) is primarily engaged in providing to residents—
    (A) skilled nursing care and related services for residents who require medical or nursing care,
    (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or
    (C) on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities . . . .
42 U.S.C. § 1396r(a).

[8]  The Medicare statue defines a SNF as
  [A]n institution (or distinct part of an institution) which—
  (1) is primarily engaged in providing to residents—
    (A) skilled nursing care and related services for residents who require medical or nursing care, or
    (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, and is not primarily for the care and treatment of mental diseases . . . .
42 U.S.C. § 1395i-3(a).

residents . . . not . . . that Friel was primarily engaged in providing skilled nursing and/or rehabilitative services." Id. Accordingly, the Court concluded that the Secretary's equivalency determination lacked substantial evidence in the record and had to be overturned. Id.

## II.    Standard of Review

Judicial review of a decision rendered by the Secretary is governed by the standards established by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). Under the APA, a court can set aside an agency action if the court finds the action to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Similarly, a Court should set aside any agency decision issued on the basis of an evidentiary hearing record if the agency decision is "unsupported by substantial evidence" in the record. 5 U.S.C. § 706(2)(E).

A court must give substantial deference to an agency's interpretation of its own regulations, Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945), and that interpretation "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation'" itself, Thomas Jefferson, 512 U.S. at 512 (quoting Bowles, 325 U.S. at 414). Under this test, a court must defer to an agency's interpretation of a regulation unless an alternative reading is "compelled by the regulation's plain language" or, if the language is ambiguous, by "other indications of the Secretary's intent at the time of the regulation's promulgation." Id. Accordingly, if the language of a regulation does not "speak[] clearly 'to the precise question at issue'" in a case, "say[ing] nothing explicitly about" the specific matter in dispute, the court must give substantial deference to the agency's resolution of the resulting ambiguity. Barnhart v. Walton, 535 U.S. 212, 217-19 (2002). The court's task then is "not to

decide which among several competing interpretations best serves the regulatory purpose;" rather, the court's limited role is to set aside only those agency interpretations that affirmatively are plainly "inconsistent" with the regulation itself.  Thomas Jefferson, 512 U.S. at 512.  The Supreme Court has recognized that this heightened deference is particularly warranted in the Medicare context because of the complex and highly technical nature of the program, where "the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'"  Thomas Jefferson, 512 U.S. at 512.

### III.   Legal Analysis

In this case, this Court is asked to review the decision of the Administrator, made on behalf of the Secretary, denying Milton's request for a new provider exemption following an administrative hearing. A.R. at 1-13, 232-458.  As already discussed, to uphold this decision, this Court must conclude that there was substantial evidence in the record to support both (1) that Milton operated previously under "present or previous ownership," and (2) that the Neponset facilities operated as a SNF or its equivalent.  St. Elizabeth's, 396 F.3d at 1231.  Adhering to the guidance provided by the Circuit Court, this Court will also begin its analysis by addressing the Administrator's second argument.[9]

_____

[9] In its initial papers submitted to the Court, the plaintiff avers that this Court lacks jurisdiction to review this aspect of the Administrator's decision. Pl.'s Mem. at 30.  Specifically, the plaintiff contends that because this issue was not addressed by the PRRB, it was improper for the Administrator to address it and thus this portion of the ruling is a "legal nullity and of no effect." Id.  The plaintiff's argument has no merit.  The Medicare statute clearly states that the PBBR's decision is final unless the Secretary "reverses, affirms, or modifies the Board's decision."  42 U.S.C. § 1395oo(f)(1).  In this case, the Administrator of the CMS, acting on behalf of the Secretary, reviewed the PBBR decision and the record evidence underlying that decision.  A.R. at 1-13.  Nothing in the statute mandates that the Administrator remand the proceedings back to the PBBR; rather, he has the statutory authority to modify and reverse the ruling, 42 U.S.C. § 1395oo(f)(1), which he did in this case.  Clearly, the Administrator was acting within his authority in issuing this final decision, which was appealed to this Court.  Accordingly, the Court can properly review the entire decision of the Administrator, and not only a portion of the decision.

**(A)      Did the Neponset Facilities Operate as a SNF or its Equivalent?**

In deciding the equivalency issue, the Administrator found

> that the record shows that the prior owner of the beds, as a NF, was a Medicaid
> certified Nursing Facility, and had provided skilled nursing and related services
> for more than three years prior to the transfer of ownership.  Thus, the prior owner
> was clearly an equivalent provider of skilled nursing and/or rehabilitative services
> for more than three years.

A.R. at 11.  To support this conclusion, the Administrator relied on (1) his interpretation of the

statutory and regulatory definitions of a Medicaid-certified NF and a Medicare-certified SNF,

and (2) the evidentiary record.  A.R. at 11-12.  First, the Administrator noted that the nursing

home reform provisions of the Omnibus Budget Reconciliation Act of 1987 established a

uniform certification standard for both Medicare-certified SNFs and Medicaid-certified NFs.  Id.

at 11.  Thus, the Administrator concluded that under this uniform standard, both SNFs and NFs

"are required to provide directly or indirectly, the same basic range of services."  Id.  Thus, the

Administrator found that "the fact that the prior owner of the DON rights was a NF supports the

conclusion that it was clearly an equivalent provider of skilled nursing and/or rehabilitative

services for more than three years."  Id.  In addition, the Administrator noted that a report from a

CMS database makes clear that the following services were provided at the Neponset facilities:

"indwelling and external catheters, bowl and bladder training, care of pressure ulcers, respirator

care, trach care, special rehab services, injections and tube feeds," which he seems to conclude

are skilled nursing or rehabilitative services.  Id. at 11-12 & n.12.

Now, the defendant advances three arguments to support the Administrator's decision.  In

addition to the aforementioned mentioned legal argument and the alleged evidentiary support in

the CMS database report, A.R. at 774-77, the defendant relies heavily on the Management

Minutes Questionnaires and Management Minutes Questionnaire Turnaround Documents

(collectively "MMQ"), which are included in the administrative record.  Def.'s Supp. Mem. at 4;

A.R. at 1317-2706.  The MMQ is used on a quarterly basis by the Massachusetts Medicaid

program to catagorize patients based on the care provided to them in order to determine a

reimbursement rate for each patient in a facility.  A.R. at 1273-74.  The MMQ documents the

services provided to each Medicaid-eligible patient, and looks at, among other services, certain

"skilled" services.  A.R. at 1276, 1278, 1283-84.  Contrary to the defendant's argument,

however, for the following reasons, the record lacks substantial evidence to support the

conclusion that Neponset operated as a SNF or its equivalent.

  (1) <u>The Administrator's Legal Argument</u>

  First, the Circuit Court in <u>St. Elizabeth's</u> clearly rejected the Administrator's legal

conclusion that because SNFs and NFs are established under uniform certification standards, NFs

are the equivalent to SNFs.  In fact, the Administrator's legal conclusion in this case is identical,

word-for-word, to the legal conclusion reached by the Administrator in <u>St. Elizabeth's</u> and

rejected by the Circuit Court.  <u>Compare</u> A.R. at 11, <u>with</u> <u>St. Elizabeth's</u>, 396 F.3d at 1233.  The

Circuit Court, when comparing the statutory definitions of both a Medicaid-certified NF and a

Medicare-certified SNF, noted that "a facility must be <u>primarily</u> engaged in providing skilled

nursing or rehabilitative care to qualify as a SNF, whereas a facility need not even offer such

services at all to qualify as a NF."  <u>St. Elizabeth's</u>, 396 F.3d at 1234 (emphasis in original).

Thus, as the Circuit Court held, "the bare fact that an institution has gained NF status or is

operating as a NF, without more, is not sufficient to qualify the NF as a SNF or its equivalent."

<u>Id.</u>  Accordingly, the defendant's equivalency argument, without more, does not support the

Administrator's decision.[10]

(2)    The Administrative Record

The Circuit Court in St. Elizabeth's made clear that courts must look beyond the label carried by a facility, but instead must assess the services actually provided by that facility.  Thus, to be qualified as an SNF or its equivalent, the institution must be "primarily engaged in providing to residents" skilled nursing care and rehabilitative services. 42 U.S.C. § 1395i-3(a). While an NF can provide such services, it does not need to do so in order to qualify as a NF, so long as on a regular basis it primarily provides "[h]ealth-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities . . . ." 42 U.S.C. § 1396r(a).  Therefore, while a NF can be the equivalent of an SNF if it provides skilled nursing and rehabilitative care, it is not the equivalent if it only provides, for lack of a better phrase, "custodial care."  See St. Elizabeth's, 396 F.3d at 1234.  Accordingly, the Court must turn to the administrative record to determine if there is substantial evidence in the record to support the Administrator's decision.  As previously discussed, the defendant alleges that the information from the CMS database and the MMQs supports the conclusion that Neponset was operated as a SNF or its equivalent.  Def.'s Mem. at 35; Def.'s Supp. Mem. at 4-7.  The defendant's argument, however, simply misses the mark.

---

[10]  The defendant appears to now argue, without any legal support, that a SNF and a NF are equivalent on their face based upon the regulations governing the services that may be provided and paid for under the Medicaid program.  Def.'s Supp. Reply at 4-5.  Specifically, the defendant notes that "the Secretary has defined NF services under Medicaid as the very same services provided by a SNF under Medicare."  Id. This argument simply ignores the clear statutory definitions of a NF and a SNF, which, as the District of Columbia Circuit has concluded, provides that an NF can provide services different than the services provided by a SNF.  St. Elizabeth's, 396 F.3d at 1233-34. Thus, the defendant's argument has no merit.

14

(a)      The CMS Database Report

The CMS database report, A.R. at 774-77,  identifies four dates during which a survey was completed at Ashmont Manor documenting the number of times particular services were provided to patients.  Id.  This survey represent particular points in time when the survey was conducted, and does not represent data from an ongoing reporting system.  A.R. at 308 (Julie Stankiivic deposition).  After reviewing the report, the Administrator concluded that the Neponset facilities were providing the following services: "indwelling and external catheters, bowl and bladder training, care of pressure ulcers, respirator care, trach care, special rehab services, injections and tube feeds." Id. at 11-12 & n.12.  However, after reviewing the CMS database report, this Court cannot conclude that the report supports the Administrator's conclusion that the Neponset facilities operated as the equivalent of a SNF.

The data contained in the CMS database report relied on by the Administrator is limited to Ashmont Manor, which constitutes roughly one-half of the total beds at the two Neponset facilities, and captures the services provided at those facilities only at limited, distinct periods of time.[11]  A.R. 308, 774-76.  This report fails to support the Administrator's ruling for a number of reasons.  First, the beds that were transferred from the Neponsent facilities to Milton came from Neponset Hall, not Ashmont Manor.  A.R. at 3209 (letter from department of Health and Human Services notifying Neponset that it has eliminated 20 beds at Neponset Hall on the same date that Milton became licensed for 20 beds).  Thus, because this report's data is limited to a different

---

[11]  The Administrator relies on Ex. I-33, located at A.R. 774-76, and thus that is what this Court focuses on as well.  However, Ex. I-34, located at A.R. 777-80, appears to account for all the beds at both Neponset facilities— Neponset Hall and Ashmont Manor—and it is unclear why the Administrator did not consider this exhibit.  Nevertheless, even if this Court were to rely upon Ex. I-34 now, for the reasons stated herein, this exhibit would not provide support for the Administrator's decision.

facility, it provides no support whatsoever for the Administrator's ruling.  Nevertheless, even if this Court were to conclude that the same type of services were provided to patients in Neponset Hall in the same numbers, this report simply represents the type of services that were performed at these discrete, annual points in time.  A.R. at 308.  There is no evidence that these services were being provided on an ongoing or regular basis.  Thus, the CMS database report simply does not support the conclusion that the Neponset facilities were primarily engaged in skilled nursing or rehabilitative services.  Rather, at most, the report demonstrates that Ashmont Manor was engaged in some skilled nursing services on the days the survey data was collected.

In any event, even if this Court were to assume that the CMS database report represents the types of services performed at Neponset Hall, or the Neponset facilities collectively, and that the services reflect the type and number of services conducted on a regular basis during the three year "look back period"[12] when the data was collected, the information in that report does not support the conclusion that the facility was primarily engaged in providing skilled nursing or rehabilitative services, or anything more than the delivery of health-care related services.  First, even assuming that each entry of a health-care services on the CMS database represents a skilled-nursing service, and each entry represented such a service to a different patient (as opposed to one patient receiving multiple services), only 45% of the residents at Ashmont Manor received such services in 1993 and 31% in 1994.[13]  Pl.'s Supp. Mem. at 12.  Because the data shows that

---

[12] 42 C.F.R. § 413.30(e) prohibits the Secretary from granting a new provider exception to a facility who has operated as a SNF or its equivalent for three or more years.  To determine whether a facility satisfies this requirement, the Secretary will examine the services offered by the facility during the prior three years.  This is called the "look back period."  See, e.g., Pl.'s Supp. Reply at 3.

[13] The CMS database also provides information from surveys taken in 1991 and 1992; however, the plaintiff argues that these dates are beyond the three year look-back period, and the defendant does not contend otherwise.  Thus, this Court will not consider the data collected during those years.

such services were provided to less than half of the residents, it fails to demonstrate that

Ashmont Manor was primarily engaged in providing skilled nursing or rehabilitative services.

Accord, Chao v. Rocky's Auto, Inc., 2003 WL 1958020 (10th Cir. April 25, 2003) (noting that

by regulation "primarily engaged" means devoting "over 50 percent of the salesman's . . . time"

to "selling or servicing the enumerated vehicles."); Donovan v. Bereuter's Inc., 704 F.2d 1034,

1038 (10th Cir. 1983); Lindenberg v. Dep't of Justice, 657 F. Supp. 154, 159 (D.D.C. 1987).

  In addition, based upon the paucity of information contained in the CMS database report,

this Court cannot even assess whether the services provided to patients were skilled nursing and

rehabilitative services, or were merely health-related care services provided in an institutional

setting.  In fact, according to Medicare regulations, many of the services listed in the CMS

database report can be provided as either skilled or unskilled services.  For example, the CMS

database report lists as a service, services provided to residents related to catheters.  And the

column, labeled "Cont. Cath." includes both indwelling catheters, as well as an external catheter,

and requires the individual completing the form to count the number patients that maintain

continence with some type of catheter.  A.R. at 308, 771.  First, the descriptions of catheters in

the CMS instructions does not define a service provided by a nursing facility, rather it defines

and classifies patients, those with catheters.  Id.  Second, even if this designation constitutes a

service provided to a patient, there is simply no way to know whether that service is skilled or

unskilled.  Specifically, "[r]outine services to maintain satisfactory functioning of indwelling

bladder catheters" is an unskilled services, 42 C.F.R. § 409.33(d)(3), while "[i]nsertion and

sterile irrigation and replacement of suprapubic catheters" is a skilled nursing service, 42 C.F.R.

§ 409.33(b)(4).  In fact, Julie Stankivic, testifying on behalf of the intermediary for the plaintiff's

application to the defendant,[14] acknowledged that it was not possible to determine whether the

CMS database report was identifying skilled or unskilled services when it referenced the use of

catheters.  A.R. at 318.  This witness made a similar concession regarding the respiratory

treatment category services, noting that the patients could have been receiving either skilled or

unskilled services.  Id. at 320.  Another example further illustrates this point.  The CMS database

report lists as a category "Skin Pres Sore," or skin pressure sores.  A.R. at 774.  While

"[t]reatment of extensive decubitus ulcers" is a skilled nursing service, 42 C.F.R § 409.33(b)(6),

"[p]rophylactic and palliative skin care, including bathing and application of creams, or treatment

of minor skin problems" is not a skilled nursing service.  42 C.F.R. § 409(d)(5).  On this record,

it is clear that the CMS database report provides no support for the Administrator's conclusion

that the Neponset facilities operated as a SNF or its equivalent, as the record evidence does not

support a finding that Neponset was primarily engaged in providing skilled nursing and/or

rehabilitative services.

      (b)    <u>MMQ Documentation</u>

     The Secretary, in his supplemental briefs that have been filed with this Court, also relies

heavily on the MMQs[15] to support his conclusion that Neponset operated as a SNF or its

equivalent.  Def.'s Supp. Mem. at 4-7.   MMQs are "required for all new Medicaid . . . residents

at the time of admission to the facility . . . [and] is used on a quarterly basis by each facility for

updating the Management Minutes Category for all Medicaid eligible residents."  A.R. at 1273.

---

[14]  To apply for the new provider exemption, the applicant submits its application to a "fiscal intermediary," who then forwards the request to the CMS.  <u>See, e.g.</u>, Def.'s Mem. at 12.

[15]  The quarterly updates are called the Management Minute Questionnaire Turnaround Documents.  A.R. at 1274.  The Court refers to all the Management Minute Questionnaire documents collectively as MMQs.

Each MMQ must be completed by a licensed nurse.  Id. at 1273.  Specifically, the MMQ documents the nursing services patients have received during the month immediately preceding the month of the survey.  Id. at 1274.  In this case, the record contains MMQs for both Neponset facilities from January 1991 until March 1995, a total of eighteen quarterly MMQs, comprising over thirteen hundred pages.  Id. at 1317-2706.

Despite the large number of documents, the MMQs, just as the CMS database report, do not support the Administrator's conclusion.[16]  The MMQs have twenty-four separate categories. A.R. at 1292.  For each category, the licensed nurse completing the form must assign both a numerical code which designates the reason for selection of that category, A.R. at 1276-78, and a score which identifies the type of service performed for an individual resident, id. at 1277-90. Based upon the completed MMQs, the defendant asserts that the Neponset facilities were engaged in nursing services that were the same as or equivalent to a SNF.  As support for this argument, the defendant has provided the Court with a compendium of patients and the type of skilled service they received.  See Def.'s Supp. Mem., Ex. 1.  When reviewing this index of services, it is apparent that defendant relies on a number of different categories, which he classifies as skilled nursing or rehabilitation services.  However, while both this Court and the plaintiff concede that some of the services offered by the Neponset facilities might rise to the level of skilled nursing or rehabilitative services, it is clear that many also do not.[17]  Pl.'s Supp.

---

[16]  The Court notes that the Administrator does not appear to rely upon the MMQ's for his decision, as they are not mentioned in his decision.

[17]  The plaintiff contends that a number of the MMQs are outside of the three-year look-back period.  The defendant has not responded to this allegation, and thus the Court will consider it as conceded and will not look beyond the three-year look-back period.  Nevertheless, even if this Court looked beyond the three-year look back period, for the same reasons stated herein, the Administrator's decision is still without substantial support in the record.

Reply at 13.

First, the vast majority of patients listed in the defendant's index are described as receiving the "skilled service" of "medication administration."  Pl.'s Supp. Mem., Ex. 1-108. While the defendant does not direct this Court to which part of the MMQs' "medication administration" category he is referencing, it appears that the defendant is referring to the dispensing and charting of medication entries.  A.R. at 1277-78.  However, there is simply no merit to the defendant's contention that this is a skilled service.  For one thing, the instructions of the MMQ require that every completed form contain the code for dispensing and charting medication.  Id.  Specifically, the instructions state that "[a]ll residents receive 30 points since it reflects the necessary presence of a licensed nurse on duty at the nursing unit."  Id. at 1278.  And, the MMQs are preprinted with the appropriate boxes already completed.  Id.  Thus, the nurse completing this form has no discretion to assess whether a patient is in fact receiving this service or to determine whether the receipt of this service constitutes a skilled nursing or rehabilitative service.  Moreover, in the instructions for completing the MMQ, dispensing and charting medication is defined as "[p]ouring, delivering and charting medications; including routine injections, prn medication, eye drops, eye ointments, and suppositories . . . ."  Id.  at 1277.  Some of these services are clearly, by regulation, not skilled services.  42 C.F.R. § 409.33(d)(1) (stating that "[a]dministration of routine oral medications, eye drops, and ointments" are not skilled services).  Accordingly, the administration of medication at the Neponset facilities does not support the conclusion that Neponset provides skilled nursing or rehabilitative services.

The defendant also identifies a number of patients who have received "Other Skilled Procedures."  Pl.'s Supp. Mem., Ex. 1 at 1-108.  Here, the defendant refers to line item 12 of the

MMQ—"Skilled Procedure Daily – Other."  A.R. at 1284.  Within this category, the MMQ

instructions require that the nurse completing the form enter an appropriate procedure code, 1

through 14, which represent different types of services.  Code 14 designates "other" skilled

procedures.  The instructions provide no guidance on what "other skilled procedures" entail.

However, Sharon Aker, a Neponset employee, stated that "'Other' was the code that we could

capture the application of topical ointments."  A.R. at 259.  As already discussed, the application

of ointments is not a skilled service.  42 C.F.R. § 409.33(d)(1).  Thus, again, providing services

that fall within this category does not support the Administrator's conclusion, as these services

are not skilled nursing or rehabilitative services.

A third example is further proof that the MMQs do not support the Administrator's

ruling.  Under line 13 of the MMQ, the nurse completing the form is required to indicate that a

resident has Behavioral Problems if "[t]he resident displays, at least three times per week,

selected types of behavior that are generally considered dependent or disruptive, and require staff

intervention such as: disrobing or exposing oneself; screaming; being physically abusive to

oneself or others; stealing; getting lost or wandering into inappropriate places; inability to avoid

simple dangers."  A.R. at 1285.  There is simply no evidence in the record, and the defendant

points to none, that even hints that addressing these types of problems rises to the level of a

skilled nursing service.  In fact, the only evidence in the record is to the contrary.  Namely, Ms.

Aker testified that handling these types of behavioral problems does not implicate skilled nursing

services.  A.R. at 263.

Admittedly, some of the services listed on the MMQs appear on their face to be skilled

services.  However, for many other services, it is simply impossible to determine whether those

services qualify as skilled nursing services.[18]  Accordingly, this Court must conclude that the

decision by the Administrator regarding the equivalency finding simply lacks substantial support

in the record.  Therefore, his decision must be vacated.[19]

**(B)    Remedy**

Having concluded that the Administrator's decision was not based on substantial

evidence in the record, the next question the Court must address is what is the proper remedy?

The defendant posits that the case should be remanded to the agency for further proceedings,

Def.'s Supp. Reply at 10-11, while the plaintiff posits that the case should not be remanded

because the Secretary has already had an opportunity to put evidence into the record and the

record is now closed, Pl.'s Supp. Reply at 1.   "The language of the APA . . . allows courts only

to 'hold unlawful and set aside' illegal agency action."  Heartland Hosp. v. Thompson, 328 F.

Supp. 2d 8, 14 (D.D.C. 2004).  The Supreme Court has made clear that "[i]f the record before the

agency does not support the agency action, if the agency has not considered all relevant factors,

or if the reviewing court simply cannot evaluate the challenged action on the basis of the record

before it, the proper course, except in rare circumstances, is to remand to the agency for

---

[18]   The Court also notes that a MMQ indicating that residents were treated for ulcers, received inhalation services, and received sterile dressings, A.R. at 1282-84, provides no support for the Administrator's decision.  First, the treatment of stage 1 and 2 ulcers does not implicate a skilled nursing procedure. A.R. at 258 (testimony of Sharon Aker).  Second, it is impossible to determine from the MMQ whether a patient receiving inhalation treatment, A.R. at 1284, is being provided the "[i]nitial phases of a regimen involving administration of medication gases," which is a skilled service or is "[r]outine administration of medical gases after a regimen of therapy has been established," which is not.  Compare 42 C.F.R. § 409.33(b)(8), with 42 C.F.R. § 409.33(d)(10); see also A.R. at 262-63 (testimony of Sharon Aker).  Finally, simply because a resident received a sterile dressing does not mandate the conclusion that the service is a skilled nursing or rehabilitative service.  Compare 409.33(b)(5), with 42 C.F.R § 409.33(d)(4); see also A.R. at 262 (testimony of Sharon Aker).

[19]   Because the Administrator was required to find both equivalency and that Milton was previously operated as a SNF to sustain the ruling that Milton was not entitled to a new provider exception, the Court need not make a determination as to the previously operated component of the test to invalidate the Administrator's ruling.

22

additional investigation or explanation." <u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985); <u>see also</u> <u>Tourus Records, Inc. v. DEA</u>, 259 F.3d 731, 737 (D.C. Cir. 2001) (citing <u>Lorin</u>, 470 U.S. at 744).  Accordingly, because this is not one of those rare situations where contrary action should be taken, the Court must conclude that this case should be remanded to the agency for further consideration of the plaintiff's new provider exemption request for its skilled nursing facility.

**VI.    Conclusion**

For the aforementioned reasons, this Court must vacate the Administrator's ruling because it is not supported by substantial evidence.  Accordingly, this Court must deny the defendant's motion for summary judgment, and grant the plaintiff's motion for summary judgment.

**SO ORDERED** this 27th day of June, 2005.

Reggie B. Walton
United States District Judge